**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

**MILWAUKEE DIVISION**

| | |
|---|---|
| **DERRICK HARRIS, JIM SCHWARTZ, KATRINA JONES, and JAMES GABRIEL**, individually and on behalf of all others similarly situated, | Case No. <br><br> Judge |
| Plaintiffs, <br><br> v. | **CLASS ACTION** <br> **JURY TRIAL DEMANDED** |
| **ADVOCATE AURORA HEALTH, INC**. | |
| Defendant. | |

## CLASS ACTION COMPLAINT

Plaintiffs Derrick Harris, Jim Schwartz, Katrina Jones, and James Gabriel, individually and on behalf of all others similarly situated (collectively "Plaintiffs"), bring this Class Action Complaint against Advocate Aurora Health, Inc. ("Advocate" or "Defendant"), and allege, upon personal knowledge as to their own actions, and upon information and belief as to all other matters, as follows:

## INTRODUCTION

1.      Advocate is headquartered in the states of Illinois and Wisconsin. As of 2021, Advocate maintained 27 hospitals and more than 500 sites of care, with 75,000 employees, including 10,000 employed physicians. Advocate is one of the largest healthcare providers in the United States.

2.      Healthcare organizations and providers like Advocate that collect and store patient's private information and medical records have statutory, regulatory, contractual, fiduciary

1

and common law duties to safeguard that information from disclosure and ensure that it remains private and confidential. Advocate is duty bound to maintain the confidentiality of patient medical patient records and information, and is further required to do so by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and by Wisconsin and Illinois law and statute, as more fully discussed below.[1]

0. In addition to violating HIPAA, defendant violated the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2510, *et seq.*, Wisconsin Statute § 146.81, *et seq.*, regarding confidentiality of patient health or medical records, Illinois statue 410 ILCS 50, *et seq.*, regarding the duty to maintain the confidentiality of patient health records, and other privacy and contractual patient rights by knowingly and repeatedly procuring the interception of, transmitting and disclosing, the personally identifiable information (PII), sensitive and confidential statutorily-protected patient health information (PHI) of Advocate's patients included within or comprising their private information, and invasion of their privacy rights, without their knowledge, authorization, or consent.

1. Indeed, Defendant's knowing implementation of tracking software that collects and discloses patients' private health and identifying information to third parties and marketers, as more fully discussed below, is an egregious breach of Advocate's duties imposed by law and statute.

2. Plaintiffs bring this class action against Defendant for nominal, compensatory, and punitive damages arising from Advocate's failure to properly secure and safeguard healthcare patients' personally identifiable information and personal health information, including names, email addresses, phone numbers, computer IP addresses, emergency contact information,

---

[1] The Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), Pub. L. No. ~~104-191, 110 Stat. 1936 (1996~~), ("HIPAA"), and regulations of the United States Department of Health and Services ("HHS") promulgated thereunder, are designed to protect the confidentiality and guard against the unauthorized disclosure of or medical records, patient health care information, medical records, and other individually identifiable healthcare information.

2

appointment information, medical provider information, medical histories, and other content submitted on Defendant's website and patient portal. ("Private Information").

3.      Patients of Advocate have a reasonable expectation of privacy respecting all forms and content of their communications with Advocate and its affiliated healthcare professionals and systems, including, but not limited to, diagnoses, treatment information, PII and PHI. They also have a protected interest and right to expect that such information will not be intercepted, transmitted, re-directed, or disclosed to third parties, and that Advocate will not enable their procurement by third parties, including, but not limited to, Facebook, without their prior knowledge, authorization, or consent.

4.      Advocate invited patients to utilize its patient online MyChart portal (branded as "LiveWell" to patients) to communicate with Advocate, including, its affiliated doctors, request prescription refills, access test results and medical results, view their account details, schedule appointments, make payments, and access their doctor's notes.

5.      To that end, and despite its full knowledge of the private and confidential nature of patients' Private Information being placed or otherwise stored, and their privacy rights, Advocate configured and implemented a tracking pixel ("Pixel") to knowingly collect and transmit information from its website to third parties and assist them in procuring confidential healthcare information – including information communicated in sensitive and presumptively confidential patient portals and mobile apps like its MyChart portal and LiveWell app.[2] However, unknown to Plaintiffs and users, Advocate did not protect and utterly failed to safeguard patients' Private Information, which includes PHI and PII from access, interception and procurement by third

_____

[2]      Advocate's Pixel is a piece of code that was utilized for marketing purposes by enabling organizations to measure activity and enhance consumers' or customers' experiences on web properties. The Pixel embeds invisible code in each page a visitor to the website views and thereby captures Private Information which can include contact information, *e.g.*, one's home address, phone number, email address, medical information and related concerns, treatment history, search queries, visitors' IP addresses, and browser identifiers. The code Advocate implements enables third parties, such as Facebook, and others, to procure the Private Information and further advertisers' and Defendant's respective profit-motive business purposes.

3

parties, including Facebook. The Pixel and other tracking software installed on Advocate's web was configured so as to enable Advocate and third parties to gather various information collected from visitors to the sites and perform analytics and research that Advocate used to increase its own profits.

3.     In patent violation of its duties and the privacy rights of patients, Advocate enabled such third parties, including Facebook, to intercept and procure confidential patient information and Private Information, or otherwise assist third parties with intercepting their confidential communications with healthcare providers, despite the fact that Plaintiffs and similarly situated Class Members did not consent, agree, authorize, or otherwise permit Advocate to do so. Advocate did not provide Plaintiffs with any written notice that it discloses its website users' Private Information to third parties. Nor were Plaintiffs given the option of opting out of such disclosures. Despite this, Advocate knowingly disclosed Plaintiffs' protected Private Information, including their private identifying information and health information, to third parties, including Facebook.

4.     Advocate's violations of patient rights and statutes persisted without their consent for a substantial period of time. Meanwhile, all third parties and Advocate financially benefitted from the resulting data mining. Then, on October 20, 2022, Advocate disclosed and confirmed its violations when it was forced to post a "Notice of Breach" on its website, publicly disclosing for the first time that "[w]hen using some Advocate Aurora Health sites, certain protected health information ("PHI") would be disclosed in particular circumstances to specific vendors because of pixels on our websites or applications." So far, Advocate has admitted that the following sensitive patient information appears to have been involved based on its ongoing investigations: patient IP addresses; dates, times, and/or locations of scheduled appointments; patients' proximity to an Advocate location; information about patients' medical providers; type of appointments or medical procedures; communications between patients and others through MyChart, which may have included first and last names and medical record numbers; information about whether patients had insurance; and, if patients had a proxy MyChart account, the patient's first name and the first name

4

of their proxy. Advocate further disclosed that the Private Information, including confidential medical information, of over 3,000,000 individuals was, or may have been, compromised.

5.      Plaintiffs and Class Members relied upon Defendant to maintain the security and privacy of the Private Information they entrusted to it, and have a reasonable expectation and a right to expect that Defendant would and must comply at all times material with its obligations to keep their Private Information secure and safe from unauthorized access and disclosure.

6.      Defendant knowingly implemented and configured its Pixel to disclose the identities and communications of its patients to Facebook and third parties. Defendant implemented the code on its website, all the while with the knowledge and intent to specifically identify its patients to Facebook and third parties alongside their protected health information and geographic location, in direct and patent violation and disregard of the rights of Plaintiffs and Class Members. Advocate's conduct was intentional, willful, reckless, and/or negligent, and constitutes a patent breach of Advocate own stated privacy policy promised to patients. As a result, Plaintiffs and Class Members' Private Information was compromised through disclosure to Meta, Facebook, Goggle, and other unknown and unauthorized third parties.

7.      Plaintiffs bring this action on behalf of all persons whose Private Information and privacy was accessed or otherwise compromised, in whole or in part, through procurement and interception by third parties, including Facebook, on account of Defendant's Advocates pursuit of its own self-interests and profit motive by its knowing and willful disclosure.

**PARTIES**

*Plaintiff Derrick Harris*

8.      Plaintiff Derrick Harris ("Harris") is a citizen and resident of Park Forest, Illinois.

9.      Plaintiff Harris received healthcare services in July, 2021 from one of the hospitals in Advocate's network that relied on Advocate's digital healthcare platforms to communicate confidential patient information.

10.      Plaintiff Harris has been a Facebook user since 2013.

11.     Plaintiff Harris accessed Defendant's LiveWell digital tools to receive healthcare services from Defendant and at Defendant's direction and encouragement. Plaintiff Harris reasonably expected that his online communications with Advocate were confidential, solely between himself and Advocate, and that such communications would not be transmitted to or intercepted by a third party.

12.     Plaintiff Harris provided his Private Information to Defendant and trusted that the information would be safeguarded according to Advocate's privacy policies. Plaintiff Harris never consented to use of his Private Information by third parties or to Advocate enabling third parties to access or intercept such information.

**Plaintiff Jim Schwartz**

13.     Plaintiff Jim Schwartz ("Schwartz") is a citizen and resident of Buffalo Grove, Illinois.

14.     Plaintiff Schwartz received healthcare services commencing in 2000 from one of the hospitals in Advocate's network and has relied on Advocate's digital healthcare platforms to communicate confidential patient information. Plaintiff Schwartz has been using Advocate LiveWell ever since 2018.

15.     Plaintiff Schwartz has been a Facebook user since 2012.

16.     Plaintiff Schwartz accessed Defendant's LiveWell digital tools to receive healthcare services from Defendant Advocate affiliates at Defendants' direction and encouragement. Plaintiff Schwartz reasonably expected that his online communications with Advocate were confidential, solely between himself and Advocate, and that such communications would not be transmitted to or intercepted by a third party.

17.     Plaintiff Schwartz provided his Private Information to Defendant and trusted that the information would be safeguarded according to Advocate's privacy policies. Plaintiff Schwartz never consented to use of his Private Information by third parties or to Advocate enabling third parties, including Facebook, to access or intercept such information.

6

***Plaintiff Katrina Jones***

6.      Plaintiff Katrina Jones ("Jones") is a citizen and resident of University Park, Illinois.

7.      Plaintiff Jones received healthcare services commencing in 2000 and thereafter from one of the hospitals in Advocate's network and has been using Advocate LiveWell at least since 2019.

8.      Plaintiff Jones has been a Facebook user since 2010.

9.      Plaintiff Jones accessed Defendant's LiveWell digital tools to receive healthcare services from Defendant Advocate affiliates at Defendants' direction and encouragement. Plaintiff Jones reasonably expected that her online communications with Advocate were confidential, solely between herself and Advocate, and that such communications would not be transmitted to or intercepted by a third party.

10.     Plaintiff Jones provided her Private Information to Defendant and trusted that the information would be safeguarded according to Advocate's privacy policies. Plaintiff Jones never consented to use of her Private Information by third parties or to Advocate enabling third parties, including Facebook, to access or intercept such information.

***Plaintiff James Gabriel***

11.     Plaintiff James Gabriel ("Gabriel") is a citizen and resident of Milwaukee, Wisconsin.

12.     Plaintiff Gabriel has received healthcare services from Advocate Aurora Health Good Hope Clinic ("Clinic") in Glendale, Wisconsin, one of the healthcare providers in Advocate's network and has been using Advocate LiveWell approximately each month or so to check lab work and doctor's appointments.

13.     Plaintiff Gabriel had a Facebook account when visiting the Clinic, and still maintains a Facebook account.

14.     Plaintiff Gabriel accessed Defendant's LiveWell digital tools to receive healthcare services from Defendant Advocate affiliates at Defendants' direction and encouragement. Plaintiff

7

Gabriel reasonably expected that his online communications with Advocate were confidential, solely between himself and Advocate, and that such communications would not be transmitted to or intercepted by a third party.

18.    Plaintiff Gabriel provided his Private Information to Defendant and trusted that the information would be safeguarded according to Advocate's privacy policies. Plaintiff Gabriel never consented to use of his Private Information by third parties or to Advocate enabling third parties, including Facebook, to access or intercept such information.

19.    As described herein, each of the above named Plaintiffs are informed and believe that Advocate transmitted to or otherwise allowed third parties such as Facebook, Google, and others access to their Private Information when Plaintiffs used Defendant's digital platforms to communicate healthcare and identifying information to Advocate.

20.    Pursuant to the process described herein, Plaintiffs are informed and believe and thereupon allege that Advocate assisted or enabled Facebook, Google, and others to procure or otherwise access or intercept Plaintiffs' confidential communications, including personally identifiable information, protected health information, and related confidential information. Advocate facilitated these interceptions without Plaintiffs knowledge, consent, or express written authorization.

***Defendant Advocate Aurora Health, Inc.***

21.    Defendant Advocate Aurora Health ("Advocate" or the "Company") is a not-for-profit health corporation incorporated in Delaware with its principal place of business headquartered in Milwaukee, Wisconsin and Downers Grove, Illinois. Advocate Children's Hospital, Aurora Health Care, Advocate Cancer Institute, Advocate Heart Institute, Advocate Brain and Spine Institute and Orthopedic Center, and facilities identified herein that were frequented by Plaintiffs, among various others, are all part of the Advocate Health system of health providers. Advocate encourages patients to utilize its Advocate LiveWell patient portal to communicate with their healthcare providers.

8

## JURISDICTION AND VENUE

22.     This Court has subject matter and diversity jurisdiction over this action under 28U.S.C. § 1332(d) because this is a class action wherein the amount of controversy exceeds the sum or value of $5 million, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one Class Member is a citizen of a state different from Defendant to establish minimal diversity. This court also has federal subject matter jurisdiction under 28 U.S.C. § 1331 with respect to claims for violating the Electronic Communications Act ("ECPA") 18 U.S.C. § 2510 *et seq.*

23.     The Eastern District of Wisconsin has personal jurisdiction over the Defendant named in this action because one of Defendant's headquarters is in this District and Defendant conducts substantial business in this District through its headquarters, offices, parents and/or affiliates.

24.     Venue is proper in this District under 28 U.S.C. §1391(b) because Defendant and/or its parents or affiliates are headquartered in this District.

### *The Enormous Value of Website User and Usage Data*

25.     Personal data (*i.e.*, gender, web browser cookies, IP addresses, and device IDs), engagement data and information (*i.e.*, how consumers interact with a business's website, applications, and emails), behavioral data (*i.e.*, customers' purchase histories and product usage information), and attitudinal data (*i.e.*, data on consumer satisfaction) from consumers is highly valuable to companies because they can use this data to improve customer experiences, refine their marketing strategies, capture data to sell it, and even to secure more sensitive consumer data.[3]

26.     Capturing and using customer data reflecting consumer behavior and to shape the buying experience can improve profits. Research shows that organizations who "leverage

---

[3]     Max Freedman, How Businesses Are Collecting Data (And What They're Doing With It), Business News Daily (Aug. 5, 2022), https://www.businessnewsdaily.com/10625-businessescollecting-data.html.

customer behavior insights outperform peers by 85 percent in sales growth and more than 25 percent in gross margin."[4]

***Healthcare Patients Have a Reasonable Expectation of Privacy in Their Interactions with Healthcare Websites, Including Advocate's.***

15.     Privacy polls and studies show that a majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' data.

16.     A study by Consumer Reports shows that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumers' data, and the same percentage believe internet companies and websites should be required to provide consumers with a complete list of the data that has been collected about them.[5]

17.     Moreover, according to a study by Pew Research Center of Americans, harbor concern about how data is collected about them by companies.[6] Healthcare patients – including Plaintiffs – have a legitimate and reasonable expectation that their personal identifying information and personal health information shall be kept private and confidential by their healthcare organizations and providers, and not shared, disclosed, secreted, sold, or monetized by them, or with the participation of third parties, without their knowing, informed, and express consent. This protection regarding such patient information is sacrosanct.

## FACTUAL ALLEGATIONS

---

[4]     4 Brad Brown, Kumar Kanagasabai, Prashant Pant & Goncalo Serpa Pinto, Capturing value from your customer data, McKinsey (Mar. 15, 2017), https://www.mckinsey.com/businessfunctions/quantumblack/our-insights/capturing-value-from-your-customer-data.

[5]     Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds, Consumer Reports (May 11, 2017), https://www.consumerreports.org/ consumerreports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety/.

[6]     Americans and Privacy: Concerned, Confused, and Feeling Lack of Control Over Their Personal Information, Pew Research Center, (Nov. 15, 2019), https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-Confusedand-feeling-lack-of-control-over-their-personal-information/.

10

*Advocate's Privacy Policy and Representations to Patients*

18.     Advocate is a large healthcare provider serving patients in Illinois and Wisconsin. Advocate patients such as Plaintiffs are encouraged by Defendant to utilize and necessarily utilize its so-called "MyChart" and "LiveWell" platforms, which allow them to schedule appointments or procedures, communicate with their healthcare providers, review their medical histories, and perform other healthcare focused communications.

19.     Plaintiffs and Class Members had a reasonable expectation that Defendant's healthcare business was keeping their Private Information confidential and securely maintained, would only use this information for their own healthcare, and would not make disclosures of this information without their express authorization.

20.     At all times material, the Pixel and tracking software that Defendant installed on its healthcare portals such as MyChart and LiveWell tracked users as they navigate through the website and applications, effectively recording which pages are visited, items accessed or clicked, specific medical information users enter such as name, home address, phone number, email address, their search queries and other personal information, including the patient's IP address. The Pixel embeds Private Information into its website, while simultaneously transmitting all the information it receives to third parties, such as Facebook, thereby enabling them to procure healthcare related and other confidential and private information. These third parties procure, access and intercept such information without Plaintiffs' and Class Members' consent.

21.     Advocate patients are encouraged to use these digital tools, while promoting the convenience and functionality of the platforms. Advocate promised its patients that "the LiveWell with Advocate Aurora Health app and website are secure environments. "For more information, see our privacy policy." Defendant's "Privacy Policy" pertains to any personal information provided to Advocate. It also applies to any personal information that Advocate collects from other sources. It does not permit Defendant to use and disclose Plaintiffs' and Class Members' Private Information for marketing purposes without written permission.

11

49.     For example, the "Advocate Aurora Health Notice of Privacy Practices" states, "This notice applies to any health care facility, medical staff, medical group or other health care entity now or in the future controlled by or under common control with Advocate Aurora Health and any of its affiliates or subsidiaries (collectively referred to as "Advocate Aurora Health" and designated as an Affiliated Covered Entity)", and further states that, "Advocate Health Care does **not** sell, trade or rent personal information about its website visitors," (emphasis provided). The "Advocate Health Care Privacy Policy" also represented at all times material the following:

"Examples of how you might provide us with such personal information include: Completing a survey or feedback form; Email us with a comment or question; Subscribing to our email notification service for new editions of Health Advocate magazine; Establishing a personalized homepage via our website; Making an online appointment / request an appointment; Engaging in an online dialogue via chat; Completing an online bill payment; Scheduling and/or use of Virtual Visits; Preforming online check-in; Using site-based wayfinding functions.

...

Our web server automatically collects and records the following information: Aggregate information on what pages are accessed; Address of the website that linked to us (referral URL); Date and time you access our site; Name and release number of web browser software used; Operating system used; Visitor's domain name, but not the email address; Visitor's IP address; Age, gender and interests.

...

This site recognizes and collects, when possible, the domain name of a visitor's server (for example, advocatehealth.com or aol.com). We do not automatically collect the full email address of visitors to our website. The only way we obtain your name or email address is when you choose to provide that information to us. Examples of how you might provide us with such personal information include: Completing a survey or feedback form; Email us with a comment or question; Subscribing to our email notification service for new editions of Health Advocate magazine; Establishing a personalized homepage via our website.

...

How do we use the information we collect? Advocate Health Care does not sell, trade or rent personal information about its website visitors.

...

12

Information provided to schedule online appointment, pay online bills, chat, virtual visits and other web functions may be transferred to 3rd party vendors and partners to continue service.

...

Data collection: You may browse many areas of our website, including our home page, without disclosing any personal information about yourself. Within these areas we only collect and store the information that is automatically recognized by the Web server, such as your IP address and files you request from the server.

...

We collect the personal data that you volunteer on registration(s), survey, online chat, online bill pay, virtual/telehealth visits, or other forms, or by email. Additionally, some areas of our website might be available only to certain persons and will require a login and password to access these areas. In order to be granted a login and password you may be asked some demographic information about yourself.

...

Data analysis: As described above, we sometimes collect anonymous information from visits to our site to help us provide better customer service. For example, we measure visitor activity on our website, but we do so in ways that keep the information anonymous. We use the information that we collect to measure the number of visitors to the different areas of our site and to help us make our site more useful to visitors. This includes analyzing these logs periodically to measure the traffic through our servers, the number of pages visited and the level of demand for pages and topics of interest. The logs may be preserved indefinitely and used at any time and in any way to prevent security breaches and to ensure the integrity of the data on our servers.

...

Cookies & other technologies: We collect the anonymous information we mentioned above through the use of various technologies, one of which is called "cookies". A cookie is an element of data that the website can send to your browser, which may then be stored on your hard drive. Cookies may last for only a single session or may span multiple sessions. We use cookies to track user activity by our registered users. Finally, cookies are employed in other applications that require the storage of user data from one screen to the next."

50.     Nevertheless, Defendant violated its own Privacy Policy by unlawfully disclosing Plaintiffs' and Class Members' Private Information to Facebook, Meta, and other third parties, and

13

Case 2:22-cv-01515-LA     Filed 12/16/22     Page 13 of 35     Document 1

misrepresented that it would preserve the confidentiality of their Private Information and the anonymity of their identities.

***Advocate's Conduct Respecting Third Party Facebook and Others in Violation of Patients' Rights to Privacy and Confidentiality***

51.     Advocate's conduct enabling Facebook and other third parties to access, intercept, procure, or use patients' Private Information violates Plaintiffs' and Class Members' rights of privacy and confidentiality. Advocate's conduct violates HIPAA, particularly since it enables or allows third parties to access and procure confidential medical information and patient identifying information. Facebook's interaction with Advocate and Facebook's users and consumers who are patients of Advocate, illustrates the highly intrusive nature of this conduct and third party relationship.

52.     By way of example and background, whenever healthcare consumers initiate a Facebook account, they legally agree to its Terms, Data Policy, and Cookie Policy via a checkbox on the sign-up page. These Terms, Data, and Cookie Policies are binding upon Facebook and its users. While Facebook's Data Policy states that it "requires" businesses that use the Meta Pixel "to have lawful rights to collect, use, and share your data before providing any data to [Facebook],"[7] But Facebook does not verify that the businesses using Meta Pixel have obtained the requisite consent be share Plaintiffs' and Class Members' information. As a result, the Meta Pixel is made available to any willing business or publisher regardless of the nature of their business and, in turn, since Plaintiffs and similarly situated Class Members did not consent to or authorize Advocate's enabling Facebook to procure, access, or intercept their Private Information, Facebook's Meta Pixel contract with Advocate failed to and did not comply with HIPAA.

53.     In 2021 alone, Facebook generated $117 billion in revenue, about 97% which was from selling advertising space. In order to sell advertising space and generate revenue, Facebook highlights its ability to target users, which it effectively targets user activity both on and off its

---

[7]     See https://www.facebook.com/privacy/policy/version/20220104/.

site. Facebook compiles information it procures or intercepts into a generalized dataset called "Core Audiences," that advertisers use to apply highly specific filters and parameters for their targeted advertisements.

27. Advertisers in turn build so-called "Custom Audiences" and so-called "Lookalike Audiences" enabling them to reach new consumers and target existing customers directly. Facebook's business tools – bits of code that advertisers can integrate into their website, mobile applications, and servers – enable Facebook to intercept and collect user activity on those platforms. Its business tools enable business partners, including advertisers and others to integrate with Facebook, understand and measure their products and services, and better reach and serve people who might be interested in their products and services.

28. Defendant implemented the Facebook Tracking Pixel on its digital platforms. It is a piece of code Facebook offers to advertisers, like Advocate, to integrate into their website. The Facebook Pixel tracks the people and type of actions they take. When a user accesses a website hosting the Facebook Pixel, Facebook's software script surreptitiously directs the user's browser to send a separate message to Facebook's servers. This second, secret transmission contains the original request sent to the host website, along with additional data that the Facebook Pixel is configured to collect. This transmission is initiated by Facebook code and concurrent with the communications with the host website. Two sets of code are thus automatically run as part of the browser's attempt to load and read Defendant's websites – Defendant's own code, and Facebook's embedded code. After collecting and intercepting user data and information, Facebook processes it, analyzes it, and assimilates it into datasets like Core Audiences and Custom Audiences.

29. Advocate transmits a patient's website activity data to Facebook. Upon doing so the patient's personally identifiable information is disclosed, including their Facebook ID ("FID"), which is a unique identifier Facebook assigns to each user that allows anyone to look up the user's Facebook profile and name. Facebook can easily identify any individual on its Facebook platform with only their unique FID. Any ordinary person who comes into possession of an FID can do likewise, and can connect to the corresponding Facebook profile and the persons' real world

15

identity. A user who accesses Advocate's digital platforms while logged into Facebook will transmit the user cookie to Facebook, which contains that user's unencrypted Facebook ID.

### *Types of Personally Identifiable Patient Information and Healthcare Information that Advocate Transmits and Enables a Third Party, Such as Facebook, to Procure and Intercept*

30.     Personally identifiable patient information and personal health information that Advocate enables third parties such as Facebook to procure, access, intercept, and transmit whenever a patient uses Advocate's website or application includes, but is not limited to, patient IP addresses; dates, times, and/or locations of scheduled appointments; patients' proximity to an Advocate location; information about patients' medical providers; type of appointment or procedure; communications between patients and others through MyChart, which may have included first and last names and medical record numbers; information about whether patients had insurance; and, if patients had a proxy MyChart account, the patient's first name and the first name of their proxy.

### *Advocate Recently Acknowledges the Ongoing Disclosure and Interception of Private Information and Resulting Breach of Privacy and Data Confidentiality – the "Breach Notification"*

31.     On or about October 20, 2022, Defendant posted a "Breach Notification" on its website disclosing its exposure to and resulting procurement and interception of Private Information by third parties, including Facebook.

32.     The Breach Notification informed Plaintiffs and Class Members (in substantially the same form) of the breach:

> "Advocate Aurora Health is writing to provide transparency in its previous use of the Internet tracking technologies, such as Google and Meta (Facebook), that we and many others in our industry had implemented to understand how patients and others interact with our websites. These technologies disclose certain details about interactions with our websites, particularly for users that are concurrently logged into their Google or Facebook accounts and have shared their identity and other surfing habits with these companies.

16

When using some Advocate Aurora Health sites, certain protected health information ("PHI") would be disclosed in particular circumstances to specific vendors because of pixels on our websites or applications. Information about these technologies and steps that individuals may take to further protect their health information can be found in our FAQ.

In an effort to deliver high quality services to its community, Advocate Aurora Health uses the services of several third-party vendors to measure and evaluate information concerning the trends and preferences of its patients as they use our websites. To do so, pieces of code known as "pixels" were included on certain of our websites or applications. These pixels or similar technologies were designed to gather information that we review in aggregate so that we can better understand patient needs and preferences to provide needed care to our patient population. We learned that pixels or similar technologies installed on our patient portals available through MyChart and LiveWell websites and applications, as well as on some of our scheduling widgets, transmitted certain patient information to the third-party vendors that provided us with the pixel technology. We have disabled and/or removed the pixels from our platforms and launched an internal investigation to better understand what patient information was transmitted to our vendors.

Out of an abundance of caution, Advocate Aurora Health has decided to assume that all patients with an Advocate Aurora Health MyChart account (including users of the LiveWell application), as well as any patients who used scheduling widgets on Advocate Aurora Health's platforms, may have been affected. Users may have been impacted differently based on their choice of browser; the configuration of their browsers; their blocking, clearing or use of cookies; whether they have Facebook or Google accounts; whether they were logged into Facebook or Google; and the specific actions taken on the platform by the user.

The following information may have been involved: your IP address; dates, times, and/or locations of scheduled appointments; your proximity to an Advocate Aurora Health location; information about your provider; type of appointment or procedure; communications between you and others through MyChart, which may have included your first and last name and your medical record number; information about whether you had insurance; and, if you had a proxy MyChart account, your first name and the first name of your proxy. Based on our investigation, no social security number, financial account, credit card, or debit card information was involved in this incident.

We have disabled and/or removed tracking pixels on patient websites and applications, and we are continuing to evaluate how to further mitigate the risk of unauthorized disclosures of patient protected health information in the future. We will continue to monitor our information security systems and make improvements and enhancements where

17

appropriate. To the extent any tracking technologies are proposed in the future, such technologies will be evaluated under Advocate Aurora's enhanced, robust technology vetting process consistent with our commitments to patient privacy."

54.     As Advocate acknowledged that the information procured, accessed, intercepted, transmitted or impacted by the confidential data and Privacy Breach included:

"...your IP address; dates, times, and/or locations of scheduled appointments; your proximity to an Advocate Aurora Health location; information about your provider; type of appointment or procedure; communications between you and others through MyChart, which may have included your first and last name and your medical record number; information about whether you had insurance; and, if you had a proxy MyChart account, your first name and the first name of your proxy. Based on our investigation, no social security number, financial account, credit card, or debit card information was involved in this incident."

55.     Plaintiffs are informed and believe and thereon allege that more information was disclosed to Meta, Facebook, Google, and others during the two years' data was submitted to Meta from Defendant's system.

56.     Through its Pixel, Advocate intercepts, shares, and enables the interception of its patients' identities and online activity, including personal information and search results related to their private medical treatment. While Advocate was capable of configuring its tracking software to limit the information that it communicated to third parties, it did not do so and willfully and intentionally configured its Pixel to disseminate patients' Private Information to third parties, including Facebook, and other similar entities, placing its own business interests and profits ahead of the privacy rights of its patients or above the law.

57.     All the while, as Advocate was knowingly violating law and statute, breaching patient's confidentiality, Plaintiffs never consented, agreed, authorized, or otherwise permitted Defendant Advocate to disclose their Private Information and assist with procuring or intercepting their communications. Plaintiffs were never provided with any written notice that Defendant

discloses its patients' protected health information, nor were they provided any means of opting out of such disclosures. Defendant nonetheless knowingly disclosed Plaintiffs' protected health information to Meta, Facebook, Google, and other unauthorized entities.

58.     Plaintiffs and Class Members relied on Defendant to keep their Private Information confidential and securely maintained, to use this information for their own legitimate healthcare purposes only, and to make only authorized disclosures of this information.

59.     Plaintiffs are lawfully entitled to privacy in their protected health information and confidential communications. Advocate knowingly deprived Plaintiffs and Class Members of their privacy rights by its aforesaid conduct without notifying Plaintiffs and Class Members, and without obtaining their express written consent.

## CLASS ALLEGATIONS

60.     Plaintiffs bring this class action on behalf of themselves and on behalf of others similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure, as more fully alleged below.

61.     The Nationwide Class that Plaintiffs seek to represent ("Nationwide Class") is defined as follows:

> **All persons who received medical care from an Advocate facility or system affiliate whose Private Information was transmitted to, accessible, or intercepted by, or provided to, Facebook or other third parties from Advocate's portal or web, including all who were sent, or covered by, Advocate's Breach Notification or received a notice of the Breach.**

62.     The Wisconsin Class that Plaintiff Gabriel seeks to represent ("Wisconsin Sub-Class") is defined as follows:

> **All persons who are residents of Wisconsin who received medical care from an Advocate facility or system affiliate whose Private Information was transmitted to, accessible, or intercepted by, or provided to Facebook or other third parties from Advocate's portal or web, including all who were sent, or covered by, Advocate's Breach Notification or received a notice of the Data Breach.**

19

33.     The Illinois Class that Plaintiffs Harris, Schwartz, and Jones seek to represent ("Illinois Sub-Class") is defined as follows:

> **All persons who are residents of Illinois who received medical care from an Advocate facility or system affiliate whose Private Information was transmitted to, accessible, or intercepted by, or provided to Facebook or other third parties from Advocate's portal or web, including all who were sent, or covered by, Advocate's Breach Notification or received a notice of the Data Breach.**

34.     The Nationwide Class, Wisconsin Sub-Class, and Illinois Sub-Class are collectively referred to herein as "Class."

35.     Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

36.     Plaintiffs reserve the right to modify or amend the definition of the proposed class before the Court determines whether certification is appropriate.

37.     Class Members are so numerous that joinder of all members is impracticable. Upon information and belief, there are 3,000,000 individuals whose Private Information may have been improperly accessed in the Breach, and each Class is apparently identifiable within Defendant's records.

38.     Questions of law and fact common to the Class exists and predominates over any questions affecting only individual Class Members. These include:

a.     Whether and to what extent Defendant had a duty to protect Plaintiffs' and Class Members' Private Information;

20

b.     Whether Defendant had duties not to disclose the Plaintiffs' and Class Members' Private Information to unauthorized third parties;

c.     Whether Defendant had duties not to use Plaintiffs' and Class Members' Private Information for non-healthcare purposes;

d.     Whether Defendant had duties not to use Plaintiffs' and Class Members' Private Information for unauthorized purposes;

e.     Whether Defendant failed to adequately safeguard Plaintiffs' and Class Members' Private Information;

f.     Whether Defendant adequately, promptly, and accurately informed Plaintiffs and Class Members that their Private Information had been compromised;

g.     Whether Defendant violated the law by failing to promptly notify Plaintiffs and Class Members that their Private Information had been compromised;

h.     Whether Defendant failed to properly implement and configure the tracking software on its digital platforms to prevent the disclosure of information compromised in the Data Breach;

i.     Whether Defendant adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

j.     Whether Defendant engaged in unfair, unlawful, or deceptive practices by misrepresenting that it would safeguard Plaintiffs' and Class Members' Private Information;

75.     Plaintiffs' claims are typical of those of other Class Members because all had their Private Information compromised as a result of the Breach, due to Defendant's use and incorporation of the tracking software.

76.     This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's

21

policies challenged herein apply to and affect Class Members uniformly and Plaintiffs' challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.

77.     Plaintiffs will fairly and adequately represent and protect the interests of the Class Members in that Plaintiffs have no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiffs seek no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages Plaintiffs have suffered are typical of other Class Members. Plaintiffs have also retained counsel experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.

78.     Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

79.     The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause

22

of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

39.    The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

40.    Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

41.    Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

    a. Whether Defendant owed a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

    b. Whether Defendant breached a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

    c. Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to the disclosure of patient information;

    d. Whether an implied contract existed between Defendant on the one hand, and Plaintiffs and Class Members on the other, and the terms of that implied contract;

    e. Whether Defendant breached the implied contract;

    f. Whether Defendant adequately and accurately informed Plaintiffs and Class Members that their Private Information had been compromised;

g.      Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Breach;

h.      Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard Plaintiffs' and Class Members' Private Information;

i.      Whether Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendant's wrongful conduct.

**COUNT I**
**BREACH OF CONTRACT**
**(On behalf of Plaintiffs and the Class)**

83.     Plaintiffs and the Class repeat and re-allege each and every allegation in the Complaint as if fully set forth herein.

84.     Defendant required Plaintiffs and the Class Members to provide their Private Information, including names, email addresses, phone numbers, computer IP addresses, and emergency contact information, appointment information, and other content submitted into Defendant's website as a condition of their receiving healthcare services.

85.     As a condition of utilizing Defendant's digital platforms and receiving services from Defendant, Plaintiffs and the Class provided their Private Information and compensation for their medical care. In so doing, Plaintiffs and the Class entered into contracts with Defendant by which Defendant agreed to safeguard and protect such information, in its Privacy Policies and elsewhere, to keep such information secure and confidential, and to timely and accurately notify Plaintiffs and the Class if their data had been breached and compromised or stolen.

86.     Plaintiffs and the Class Members fully performed their obligations under the contract with Defendant.

87.     Upon information and belief, Defendant's relevant privacy policies and representations require it to take appropriate steps to safeguard the Private Information entrusted to it by the Plaintiffs and Class Members.

24

42.     Defendant breached these agreements, which directly and/or proximately caused Plaintiffs and Class Members to suffer damages, including nominal damages.

43.     Defendant breached the contracts it made with Plaintiffs and the Class by failing to safeguard and protect their Private Information, and by failing to provide timely and accurate notice to them that the Private Information was compromised as a result of the Data Breach. As a direct and proximate result of Defendant's above-described breach of contract, Plaintiffs and the Class have suffered (and will continue to suffer) the compromise and disclosure of their Private Information and identities.

44.     As a direct and proximate result of Defendant's above-described breach of contract, Plaintiffs and the Class are entitled to recover actual, consequential, and nominal damages.

**COUNT II**
**BREACH OF FIDUCIARY DUTY**
**(On Behalf of Plaintiffs and the Class)**

45.     Plaintiffs re-allege and incorporate by reference all other paragraphs in the Complaint as if fully set forth herein.

46.     A relationship existed between Plaintiffs and the Class one the one hand and Defendant on the other in which Plaintiffs and the Class put their trust in Advocate to protect the Private Information of Plaintiffs and the Class and Advocate accepted that trust.

47.     Defendant Advocate breached the fiduciary duty that it owed to Plaintiffs and the Class Members by failing to act with the utmost good faith, fairness, and honesty, failing to act with the highest and finest loyalty, and failing to protect, and intentionally disclosing, the Private Information of Plaintiffs and the Class.

48.     Defendant's breach of fiduciary duty was a legal cause of damage to Plaintiffs and the Class.

49.     But for Defendant's breach of fiduciary duty, the damage to Plaintiffs and the Class would not have occurred.

25

50.     Defendant's breach of fiduciary duty contributed substantially to producing the damage to the Plaintiffs and the Class.

51.     As a direct and proximate result of Defendant's breach of fiduciary duty, Plaintiffs and Class Members are entitled to and do demand actual, consequential, and nominal damages, injunctive relief, and all other relief allowed by law.

## COUNT III
## BREACH OF IMPLIED DUTY OF CONFIDENTIALITY
### (On Behalf of Plaintiffs and the Class)

52.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

53.     Plaintiffs and Class members were patients of the Advocate and received healthcare services from Advocate.

54.     Advocate agreed to keep Plaintiffs' and Class members' information confidential as part of establishing and maintaining the healthcare services provider/patient relationship between Advocate and the Plaintiffs and Class members.

55.     There is a duty of confidentiality implied in every healthcare provider and patient relationship, akin to an implied contract, such that healthcare services providers may not disclose confidential information acquired through the healthcare provider-patient relationship. *See e.g., Geisberger v. Willuhn*, 72 Ill. App. 3d 435, 438 (2d Dist. 1979).

56.     The implied duty of confidentiality is at least as extensive as Advocate's statutory obligations as a healthcare services provider to maintain patient confidentiality.

57.     Under the Illinois' Medical Patient Rights Act "health care provider[s]" must "refrain from disclosing the nature or details of services provided to patients." 410 ILCS 50/3.

58.     Under 735 ILCS 5/8-802, "[n]o physician or surgeon shall be permitted to disclose any information he or she may have acquired in attending any patient in a professional character."

59.     Advocate may also not disclose personally identifiable information about a patient, potential patient, or household member of a patient for marketing purposes without the patient's

express written authorization. *See* HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.501; 164.508(a)(3), 164.514(b)(2)(i)

60.     Plaintiffs and Class members performed all required conditions of their implied contracts with Advocate.

61.     Advocate breached the implied duty of confidentiality to Plaintiffs and Class members by intentionally deploying tracking pixels and web beacons on its LiveWell portal that caused the transmission of personally identifiable patient information, PHI, and communications to third parties, including Facebook.

62.     Plaintiffs seek all monetary and non-monetary relief allowed by law.

## COUNT IV
## INVASION OF PRIVACY
### (On Behalf of Plaintiffs and the Class)

63.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

64.     Plaintiffs' and Class members' communications with Advocate constitute private conversations, communications, and information.

65.     Plaintiffs and Class members have a reasonable expectation that Advocate would not disclose personally identifiable patient information, PHI, and communications to third parties without Plaintiff's or the Class members' authorization, consent, or knowledge.

66.     As a healthcare provider, Advocate has a duty to keep personally identifiable patient information, PHI, and communications confidential.

67.     Advocate expressly promises to keep patient information secure and to take "steps that are designed to make all information received from our LiveWell subscribers as secure as possible and protect against unauthorized access and use."

68.     Advocate intruded upon Plaintiffs' and Class members' privacy and by deploying tracking pixels and web beacons that caused the transmission of Plaintiff's and Class members' personally identifiable patient information, PHI, and the contents of communication Plaintiffs and Class members exchanged with their healthcare providers to third parties, including Facebook.

27

69.     Plaintiffs and Class members did not authorize, consent, know about, or take any action to indicate consent to Advocate's conduct alleged herein.

70.     Plaintiffs' and Class members' personally identifiable patient information, PHI, and communications are the type of sensitive, personal information that one normally expects will be protected from disclosure to unauthorized parties by the very entity charged with protecting it. Further, the public has no legitimate concern in Plaintiffs' and Class members' personally identifiable patient information, PHI, and communications, and such information is otherwise protected from exposure to the public by various statutes, regulations, and other laws.

71.     Advocate's conduct described herein was intentional and highly offensive to a reasonable person.

72.     Advocate's willful and reckless conduct in allowing access to and disclosure of Plaintiffs' and Class members' sensitive, personally identifiable patient information, PHI, and communications to unauthorized third parties is and was egregious conduct that would cause serious mental and emotional upset, shame or humiliation to people of ordinary sensibilities.

73.     Due to the invasion of privacy caused by Advocate, Plaintiffs and Class members suffered and will continue to suffer damages and injury as set forth herein.

74.     Plaintiffs and Class members seek all monetary and non-monetary relief allowed by law, including damages, punitive damages, restitution, reasonable attorneys' fees and costs, and any other relief that is just and proper.

## COUNT V
## VIOLATION OF THE ELECTRONIC COMMUNICATIONS ACT ("ECPA"),
## 18 U.S.C. § 2510, *et seq.*
### (On behalf of Plaintiffs and the Class)

75.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

76.     A violation of the ECPA occurs where any person "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any ... electronic communication" or "intentionally discloses, or endeavors to disclose, to any person the

contents of any ... electronic communication, knowing or having reason to know that the information was obtained through the [unlawful] interception of a[n] ... electronic communication" or "intentionally uses, or endeavors to use, the contents of any ... electronic communication, knowing or having reason to know that the information was obtained through the [unlawful] interception of a[n] ... electronic communication." 18 U.S.C. §§2511 (1)(a), (c) – (d).

77.    In addition, "a person or entity providing an electronic communication service to the public shall not intentionally divulge the contents of any communication [ ] while in transmission on that service to any person or entity other than an addressee or intended recipient of such communication or an agent of such addressee or intended recipient." 18 U.S.C. § 2511 (3)(a).

78.    As defined in 18 U.S.C. § 2510 (12), "electronic communication" means "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photo optical system that affects interstate or foreign commerce."

79.    As defined in 18 U.S.C § 2510(4), "intercept" means "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device."

80.    As defined in 18 U.S.C § 2510(8), "contents" includes "any information relating to the substance, purport, or meaning" of the communication at issue.

81.    As defined in 18 U.S.C § 2510(15), an "electronic communication service" means "any service which provides to users thereof the ability to send or receive wire or electronic communications.

82.    18 U.S.C. §2520(a) provides a private right of action to any person whose wire, oral, or electronic communication is intercepted.

83.    Plaintiffs and the Class members' use of Advocate's patient portal is an electronic communication under the ECPA.

84.    Advocate's patient portal is an electronic communication service under the ECPA.

85.     Whenever Plaintiffs and Class members interacted with Advocate's patient portal, through the Meta Pixel it deployed and ran on its website, Advocate and Facebook contemporaneously and intentionally intercepted, and endeavored to intercept Plaintiff's and Class members' electronic communications without authorization or consent.

86.     Whenever Plaintiffs and Class members interacted with Advocate's LiveWell portal, through the Meta Pixel it deployed and ran on its website, Advocate contemporaneously and intentionally disclosed, and endeavored to disclose the contents of Plaintiff's and Class members' electronic communications to Facebook without authorization or consent, and knowing or having reason to know that the electronic communications were obtained in violation of the ECPA.

87.     Whenever Plaintiffs and Class members interacted with Advocate's LiveWell portal, through the Meta Pixel it deployed and ran on its website, Advocate and Facebook contemporaneously and intentionally used, and endeavored to use the contents of Plaintiff's and Class members' electronic communications, for purposes other than providing health care services to Plaintiffs and Class members without authorization or consent, and knowing or having reason to know that the electronic communications were obtained in violation of the ECPA.

88.     Whenever Plaintiffs and Class members interacted with Advocate's LiveWell portal, through the Meta Pixel it deployed and ran on its website, Advocate and Facebook contemporaneously and intentionally redirected the contents of Plaintiff's and Class members' electronic communications while those communications were in transmission, to persons or entities other than an addressee or intended recipient of such communication, including Facebook.

89.     Whenever Plaintiffs and Class members interacted with Advocate's LiveWell portal, through the Meta Pixel it deployed and ran on its website, Advocate contemporaneously and intentionally divulged the contents of Plaintiffs' and Class members' electronic communications while those communications were in transmission, to persons or entities other than an addressee or intended recipient of such communication, including Facebook.

30

90.     Advocate and Facebook intentionally intercepted and used the contents of Plaintiffs' and Class members' electronic communications for the unauthorized purpose of disclosing and, profiting from, Plaintiff's and Class members' communications.

91.     Plaintiffs and Class members did not authorize Advocate or Facebook to acquire the content of their communications for purposes of sharing and selling the personally identifiable information and PHI contained therein.

92.     Plaintiffs, individually, on behalf of the Class members, seek all monetary and nonmonetary relief allowed by law, including actual damages, statutory damages, punitive damages, preliminary and other equitable or declaratory relief, and attorneys' fees and costs.

### COUNT VI
### VIOLATION OF CONFIDENTIALITY OF PATIENT HEALTH CARE RECORDS
### Wis. Stat. § 146.81, *et seq.*
### (On Behalf of Plaintiffs and the Class)

93.     Plaintiffs re-allege and incorporate by reference all other paragraphs in the Complaint as if fully set forth herein.

94.     Under Wisconsin law all patient health care records must remain confidential and patient health care records may only be released to a person upon the informed consent of the patient, or as authorized by the patient.

95.     Defendant disclosed the private and protected medical information of Plaintiffs and Class Members to unauthorized third parties without their knowledge, consent, or authorization.

96.     Advocate is a healthcare provider as defined by Wis. Stat. § 146.816(1).

97.     Plaintiffs and Class Members are patients, and, as a health care provider, Advocate had and has an ongoing obligation not to disclose their Private Information.

98.     The Private information disclosed by Defendant is protected health information as defined by Wis. Stat. § 146.816(f).

99.     Defendant violated Wis. Stat. § 146.81, et seq through its willful and knowing failure to maintain and preserve the confidentiality of the medical information of Plaintiffs and the

Class. Defendant's conduct with respect to the disclosure of its patients confidential Private Information was willful and knowing because Defendant configured and implemented the digital platforms and tracking software that gave rise to the Data Breach.

100.    Plaintiffs and Class Members were injured as a result of Advocate's violation of the confidentiality of patient health care law.

101.    As a result of its intentional and willful disclosure of Private Information, Plaintiffs and Class members seek all monetary and non-monetary relief allowed by law, including injunctive relief, damages, punitive damages, restitution, reasonable attorneys' fees and costs, and any other relief that is just and proper.

**COUNT VII**
**VIOLATION OF STATUTORY DUTY TO MAINTAIN CONFIDENTIALITY**
**OF PATIENT HEALTH CARE RECORDS**
**Illinois Stat. § 410 ILCS 50, *et seq.***

102.    Plaintiffs re-allege and incorporate by reference all other paragraphs in the Complaint as if fully set forth herein.

103.    Under Illinois law all patient health care records must remain confidential and patient health care records may only be released to a person upon the informed consent of the patient, or as authorized by the patient.

104.    Defendant disclosed the private and protected medical information of Plaintiffs and Class Members to unauthorized third parties without their knowledge, consent, or authorization.

105.    Advocate is a healthcare services corporation and provider as defined by 410 ILCS 501 2.02 and 2.03.

106.    Plaintiffs and Class Members are patients, and, as a health care provider, Advocate had and has an ongoing obligation not to disclose their Private Information.

107.    The Private information disclosed by Defendant is protected health information under the Illinois Medical Patient Rights Act.

108.    Defendant violated 410 ILCS 50, *et seq.*, through its willful and knowing failure to maintain and preserve the confidentiality of the medical information of Plaintiffs and the Class

when conducting its marketing research program with the assistance of Facebook and other third party search engines. Defendant's conduct with respect to the disclosure of its patients confidential Private Information was willful and knowing because Defendant configured and implemented the digital platforms and tracking software that gave rise to the Breach.

109.   Plaintiffs and Class Members were injured as a result of Advocate's violation of the confidentiality of the Medical Patients Rights Act, which imposed a duty of confidentiality on Defendant.

110.   As a result of its intentional and willful disclosure of Plaintiffs and Class Members' Private Information, Defendant is liable to Plaintiffs and Class Members for damages, whether nominal or actual and punitive damages.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray for judgment as follows:

a)   For an Order certifying this action as a Class action and appointing Plaintiffs as class Representatives and Plaintiffs' counsel as Class Counsel;

b)   For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiffs' and Class Members' Private Information, and from refusing to issue prompt, complete and accurate disclosures to Plaintiffs and Class Members;

c)   For equitable relief compelling Defendant to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety, and to disclose with specificity the type of sensitive information compromised during the Data Breach;

d)   For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

e)   Ordering Defendant's to pay for not less than three years of credit monitoring services for Plaintiffs and the Class;

)      For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

a)      For an award of punitive damages, as allowable by law;

b)      For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

c)      Pre- and post-judgment interest on any amounts awarded; and

d)      Such other and further relief as this court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand that this matter be tried before a jury.


Dated: December 16, 2022

By: /s/Nola J. Hitchcock Cross
Nola J. Hitchcock Cross

CROSS LAW FIRM, S.C.
WI State Bar No. 1015817
Mary C. Flanner
WI State Bar No. 1013095
845 North 11th St.
Lawyers' Building
Milwaukee, Wisconsin 53233
Tel: (414) 224-0000
Fax: (414) 273-7055
njhcross@crosslawfirm.com
mflanner@crosslawfirm.com

/s/ Stephen R. Basser
Stephen R. Basser

BARRACK RODOS & BACINE
Stephen R. Basser
Calif. State Bar No. 121590
E-mail: sbasser@barrack.com
Samuel M. Ward
Calif. State Bar No. 216562
E-mail: sward@barrack.com
One America Plaza
600 West Broadway, Suite 900

34

San Diego, CA 92101
Telephone: (619) 230-0800
Facsimile: (619) 230-1874

John Emerson
EMERSON FIRM LLP
2500 Wilcrest, Suite 300
Dallas, TX 7042
Jemerson@emersonfirm.com
Phone: (800) 551-8649
Fax: (501) 286-4659
(Application for bar admission forthcoming)

*Attorneys for Plaintiffs and the Putative Class*

35